# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN JOSE DIVISION

EARNEST L. PRESCOTT,

    Petitioner,

v.

KELLY SANTORO,

    Respondent.

Case No. 5:16-cv-01359-EJD

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

Re: Dkt. Nos. 1, 25

A California jury convicted Earnest L. Prescott of first-degree murder. The sentencing court applied an enhancement for the discharge of a firearm. He is currently incarcerated. He has petitioned this court for the writ of habeas corpus. For the reasons discussed below, the court denies the petition.

## I. Background

Mr. Prescott was jointly tried with Jason Jones for the June 6, 2010 murder of James Johnson. The Alameda County jury convicted Mr. Prescott and acquitted Mr. Jones on June 8, 2012. The California Court of Appeal, in considering his direct appeal, described the facts of the case as follows:

> On June 6, 2010, James Johnson was shot and killed as he walked from his home to the store. He lived in the Acorn housing complex in west Oakland, an area which was the territory of the "Acorn" gang.
>
> On the day of the shooting, defendant, then 16 years old, was in a car heading over to Sycamore Street in west Oakland, part of the turf of the "Ghost Town" gang. Armond Turner was driving, and defendant was in the front seat with Laquisha Williams. Williams was a crack dealer who at one time headed the "Q Team," which was allied with the "P Team." Both "teams" were subsets of the Ghost Town gang. Jason Jones, known as "2–9" and an individual

Case No.: 5:16-cv-01359-EJD
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

1

called "Duder," both of whom were affiliated with P Team, as well as "three or four girls" were also in the car, which belonged to Williams's sister. Defendant was also affiliated with P Team.

Williams wanted to buy some marijuana, so the group headed toward an Oakland neighborhood known as "Lower Bottoms," driving though the territory of the rival Acorn gang. Williams testified that while they were in Acorn territory, Jones said he saw a man he thought was "Birdman," who had knocked out his tooth while they were in jail. Both Officer Valle and Williams testified they knew Dionte Houff went by the name "Birdman," and that he was associated with Acorn. Jones and defendant convinced Turner, the driver, to turn the car around anyway.

Turner made a U-turn, drove back and parked in a lot by a housing unit known as "Mohr 1." Defendant and Jones got out of the car and entered the housing complex. They did not see Houff, but saw Johnson, who was walking from his home at the Acorn housing unit toward Green Valley Foods. Defendant fired multiple shots at Johnson, who fell to the ground. Johnson died from massive hemorrhaging due to multiple gunshot wounds.

After defendant and Jones left the car but before the shooting, Williams sent Duder to find out why the two were taking so much time in rival gang territory. She testified if an individual is from Ghost Town, it would be dangerous to be in Acorn. Williams then heard seven or eight shots fired, and defendant, Duder and Jones came running back to the car. Williams told police that when defendant got in the car, he had a silver and black gun, but at trial she testified she did not remember seeing a gun. Williams told police defendant told her Jones "wanted to shoot" but defendant "ran up on the dude." At trial, Williams testified what she told police was "[n]ot really" true.

At the time of the shooting, Mignon Perry was at her mother's home in the Mohr 1 unit, directly across from Johnson's home. Perry supported "Gas Team," a subset of the Acorn gang. She knew Johnson well, and thought of him as a relative. From her kitchen window, she saw Johnson headed toward the Green Valley store, which she knew was his "everyday routine." She had just opened the front door to ask him to pick something up for her when she heard multiple gunshots and Johnson shouting he had been shot.

Perry's mother slammed the front door shut, and through the window, Perry saw the shooter with a semiautomatic gun in his hand. The shooter pointed his gun at Johnson, moved closer, and aimed. After the shooting stopped, she opened the door and stepped outside, where she saw Johnson on the ground and the shooter running away. The shooter turned around when Perry swore at him, giving her the opportunity to see "the front of him," and make eye contact with him. Perry saw no one else around. Perry stayed with Johnson, who was still alive but could not speak, until police arrived.

Perry described the shooter to police as an African–American male between the ages of 16 and 18 years old, 6 feet and 1 inch tall, wearing a white T-shirt and blue jeans and carrying a silver

Case No.: 5:16-cv-01359-EJD
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
2

handgun. She would not provide a written statement at the time because the crowd that had gathered told her not to say anything to police. She later learned from "[p]eople from the neighborhood" that Williams, Turner and defendant may have been involved in the shooting. Perry was acquainted with Williams and Turner. She logged on to Williams's MySpace page, where she saw a photograph of Williams with Turner and defendant, and recognized defendant as the shooter.

In an interview with police, Perry identified defendant in the MySpace photo as the shooter. Police also showed her still photos from surveillance videos taken at Mohr 1, in which she was able to identify defendant, Williams, and Williams's car. The surveillance videos show a man identified as defendant leaving Williams's car first and heading into the housing complex, followed by a second man. About two minutes later, a youth got out of Williams's car and ran in the direction defendant and Jones had gone. Within 30 seconds, all three of them returned to the car, got in, and drove away.

The day before the shooting, Williams hosted a memorial barbecue for Anthony Dailey, known as "Active," a Ghost Town gang member killed in 2007. She had T-shirts made with Dailey's picture on them for the event. Defendant, Jones and Dailey were close, and defendant was wearing one of the memorial T-shirts on the day of the shooting.

Two days after the shooting, police arrested defendant and Williams for the murder. Ultimately, defendant and Jones were charged with murder. (Pen.Code, § 187, subd. (a).) The amended information further alleged defendant personally and intentionally discharged a firearm causing great bodily injury and death. (Pen.Code, §§ 12022.5, subd. (a), 12022.53, subds. (b) & (d), 12022.7, subd. (a).)

Police found the gun used to kill Johnson a few weeks later, in the course of investigating another shooting. Police discovered defendant was a contact in the cell phone of the individual from whom the gun was recovered.

A few months after his arrest, defendant escaped from the juvenile facility where he was being held for trial. In his cell, law enforcement found two handwritten letters addressed to "Dear Lord" in which he admitted "taking a human being life," and asked for forgiveness and a not guilty verdict.

Dkt. No. 1-6 at 4-7.[1]

Neither Mr. Jones nor Mr. Prescott testified. Dkt. No. 14-8 at 10, 51-52. Following his conviction, Mr. Prescott filed a direct appeal and petitioned the California courts for the writ of habeas corpus. On April 14, 2015, the Court of Appeal affirmed the conviction and summarily

---

[1] All citations are to this court's docket entries. Pincites go to the ECF page number of each document.

denied his habeas petition. Dkt. Nos. 1-6 at 21, 14-13 at 3. He then petitioned the California Supreme Court for review of both decisions; the California Supreme Court denied the petitions. Dkt. Nos. 1-7, 1-8.

Before this court, Mr. Prescott raises the following factual allegations: On September 28, 2011, his trial counsel, John Plaine, received an unsigned letter dated September 19, 2011 that apologized for blaming "lil Earn" for the murder and stated, "I was told to say that it was you. But in reality it wasn't you, it was Poony." Dkt. No. 14-8 at 1-2. (the "2011 Letter"). Mr. Plaine assumed the letter was written by Mr. Jones and provided the letter to Jones's attorney. Dkt. No. 14-8 at 8. On May 8, 2012—after the trial had started—Mr. Prescott gave his attorney a letter dated January 25, 2012 and signed by Mr. Jones; that letter confessed to the murder and asserted that Mr. Prescott had nothing to do with it. Dkt. Nos. 14-7 at 24 (the "2012 Letter"), 14-8 at 9. On May 13, 2012, Mr. Plaine asked David DeGarmo, a retired investigator and document analyst for the Alameda County Public Defender's Office, to analyze the handwriting in the letters. Dkt. No. 14-8 at 9, 19. A few days later, Mr. DeGarmo requested additional samples of Jones's handwriting; Mr. Plaine provided him with an additional 21 pages of documents. *Id.* at 9. On May 24, 2012, Mr. DeGarmo told Mr. Plaine in a telephone call that he could not determine whether Mr. Jones had written the Letters. *Id.* at 9-10. Mr. Plaine neither pursued the inquiry further nor introduced either Letter as evidence. *Id.*

In July of 2012—shortly after Mr. Prescott was sentenced—Mr. Jones agreed to an interview with an investigator retained by Mr. Plaine. *Id*. at 24, 52. Mr. Jones told the investigator that he had authored both Letters. *Id*. at 24, 52. He also stated that he, not Mr. Prescott, had shot Mr. Johnson, and described the events of the murder. Dkt. No. 14-10 at 48-58. The investigator recorded the interview with Mr. Jones's consent. *Id*. at 24-25. In January 2014, Mr. Jones wrote a declaration in which he stated under penalty of perjury that he shot Mr. Johnson, that he authored both letters, that the 2012 Letter is accurate, that he blamed someone else for the murder in the 2011 Letter because he was struggling with coming forward with the truth, and that he is willing to testify. Dkt. No. 14-5 at 26-27. Mr. Prescott's state habeas attorney

Case No.: 5:16-cv-01359-EJD
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
4

retained a new handwriting expert, Patricia Fisher. Ms. Fisher opined that, based on the writing samples available to Mr. DeGarmo, a handwriting examiner could conclude it was highly probable that Mr. Jones wrote the 2011 and 2012 Letters. Dkt. No. 14-5 at 45. After analyzing newly-requested handwriting samples from Mr. Jones, she concluded that a competent handwriting examiner could render an opinion of identification that Mr. Jones wrote the Letters. *Id.* Such a conclusion is the highest level of confidence that multiple writings have the same author. *Id.*

## II. Legal Standard

Federal district courts may consider petitions for the writ of habeas corpus on behalf of "a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). "By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (2)." *Harrington v. Richter*, 562 U.S. 86, 98 (2011). Section 2254(d) provides that a federal habeas court may review claims adjudicated by a state court on the merits where the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"[C]learly established Federal law" means the holdings—opposed to the dicta—of the Supreme Court at the time of the last reasoned state court decision. *Thompson v. Runnels*, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing *Greene v. Fisher*, 132 S. Ct. 38, 44-45 (2011)). Circuit court decisions "may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably." *Id.* (quotation and citation omitted). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reach by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). "Under the 'reasonable application' clause, a

Case No.: 5:16-cv-01359-EJD
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
5

federal habeas court may grant the writ if the state court identifies that correct legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The district court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 562 U.S. at 101. So, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Id.* at 103. As to § 2254(d)(2), "[a] state court decision 'based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding.'" *Stanley v. Cullen*, 633 F.3d 852, 859 (9th Cir. 2011) (quoting *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir.2004)).

The Supreme Court has repeatedly affirmed that AEDPA "imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Hardy v. Cross*, 565 U.S. 65, 66 (2011). The district court must presume any determinations of factual issues made by a state court to be correct, unless the petitioner can rebut the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). "Section 2254(d) applies even where there has been a summary denial." *Cullen v. Pinholster*, 563 U.S. 170, 187 (2011). So, "[w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98.

### III. Discussion

Mr. Prescott raises three separate claims for relief under § 2254. The first claim is "[c]o-defendant Jones' confessions were not introduced at trial in violation of Prescott's right to due process and fair trial. Jones' confessions establish Prescott's actual innocence warranting relief."

Case No.: 5:16-cv-01359-EJD
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
6

Dkt. No. 1-2 at 4.  Second, he contends that his "VIth Amendment right to effective counsel was violated.  His trial counsel failed to investigate and establish before trial that co-defendant Jones authored letters confessing to the crime and exonerating Prescott."  *Id.*  And his third claim argues that "Prescott's VIth Amendment right to confront witnesses was violated.  His conviction was based on material false testimony of one witness Prescott was not allowed to effectively impeach and cross-examine."  *Id.*

### a. Mr. Prescott's First Claim

Mr. Prescott supports his first claim by arguing that that during his state habeas proceedings, he presented sufficient new evidence to the California Court of Appeal to carry his prima facie case under the California Supreme Court decision *People v. Duvall*, 9 Cal. 4th 464, 470, 886 P.2d 1252 (1995), so that the Court of Appeal should have issued an order to show cause to the State.  Instead, the Court of Appeal summarily denied his petition.  The Court of Appeals, he argues, erred in doing so.  The petition suggests that this alleged error amounted to a "constitutional violation" that "probably resulted in the conviction of one who is actually innocent," warranting relief under *Murray v. Carrier*, 477 US 478, 496 (1986), *Schlup v. Delo*, 513 US 298, 327 (1995), and *House v. Bell*, 547 US 518, 537 (2006).  In his traverse, he contends that the California Court of Appeal violated Prescott's due process under *Hicks v. Oklahoma*, 447 U.S. 343 (1980), by not issuing the order show cause pursuant to *Duvall* and by not considering his "new evidence" as required by *In re Hall*, 30 Cal. 3d 408 (1981).  Mr. Prescott disclaims bringing a freestanding actual innocence claim.  Dkt. No. 15 at 7.  His first claim turns on the California Supreme Court decisions in *Duvall* and *Hall*.

Mr. Prescott's first claim cannot succeed for several reasons.  First, and at the most basic level, the Court of Appeal's purported errors are of California law, not federal law.  He is not in custody "in violation of the Constitution or laws or treaties of the United States," as § 2254 requires.  28 U.S.C. § 2254(a); *see also Hubbart v. Knapp*, 379 F.3d 773, 779 (9th Cir. 2004) ("Federal habeas corpus relief is generally unavailable for alleged error in the interpretation or application of state law.").  Both *Duvall* and *Hall* are California Supreme Court cases that concern

Case No.: 5:16-cv-01359-EJD
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
7

California law.  In *Duvall*, the California Supreme Court granted review "to address certain procedural rules governing petitions for writs of habeas corpus in this state" because "the modern expansion of the availability of relief on habeas corpus . . . justif[ied] a clarification of the pleading rules applicable to such petitions." 9 Cal. 4th at 470 (1995).  The *Duvall* Court clarified the procedures for state courts assessing state habeas petitions.  Specifically, the petitioner must first plead grounds for relief by stating, with particularity, the facts warranting relief, and by including documentary evidence, *e.g.* trial transcripts and/or affidavits, supporting the claim.  *Id.* at 474.  If the petitioner cannot make this showing that they are entitled to relief, then the state court should "summarily deny the petition." *Id.* at 475.  But, if the petitioner carries this prima facie case, then the court should issue an order to show cause to the respondent. *Id.* In articulating this framework, *Duvall* extends a line of California cases interpreting the California Penal Code sections regarding state habeas claims. *Id.* at 475, 476 (citing Cal. Penal Code § 1480); *see also In re Lawler*, 23 Cal. 3d 190, 194 (1979); *In re Hochberg*, 2 Cal. 3d 870, 875 n.4 (1970) (discussing Cal. Penal Code §§ 1476-77, 1483-84).  *Duvall* does not implicate federal rights.

Neither does *Hall*. *Hall* concerned evidence submitted at an evidentiary hearing in a state habeas proceeding.  30 Cal. 3d 408.  There, the California Supreme Court, while relying on its own precedent, held that in a state habeas proceeding, a petitioner "may introduce 'any evidence not presented to the trial court and which is not merely cumulative in relation to evidence which was presented at trial' insofar as it assists in establishing his innocence." *Id.* at 420 (quoting *In re Branch*, 70 Cal. 2d 200, 214 (1969)).  Thus, under *Hall*, a state habeas petitioner may rely on "information either that was known or could have been discovered by diligent investigation before trial" so long as it is not cumulative, and they first present newly discovered evidence that raises doubt to their guilt. *Id.* This holding does not implicate federal rights.  The Court of Appeal's purported violations of *Duvall* and *Hall* are not cognizable under § 2254.

In his traverse, Mr. Prescott tries to use *Hicks* as a hook to pull *Duvall* and *Hall* within the reach of § 2254.  In *Hicks*, the Supreme Court considered the direct appeal of a state appellate court decision upholding the conviction and sentencing of a criminal defendant.  The Supreme

Case No.: 5:16-cv-01359-EJD
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
8

Court held that it violated due process for the trial court to give a jury instruction based on an invalid state law mandatory sentence provision, when the valid instruction would have allowed the possibility of a substantially shorter sentence. *Id.* at 346. The Supreme Court dismissed an argument that the case concerned purely procedural mattes of state concern:

> Where, however, a State has provided for the imposition of criminal punishment in the discretion of the trial jury, it is not correct to say that the defendant's interest in the exercise of that discretion is merely a matter of state procedural law. The defendant in such a case has a substantial and legitimate expectation that he will be deprived of his liberty only to the extent determined by the jury in the exercise of its statutory discretion and that liberty interest is one that the Fourteenth Amendment preserves against arbitrary deprivation by the State.

*Id.* (citations omitted). Mr. Prescott contends that the same reasoning that applied to the state law regarding sentencing also applies to *Duvall* and *Hall*, and so the Court of Appeal denied him due process by not issuing an order to show cause. The Court of Appeal's application of *Hicks* was therefore unreasonable under § 2254(d)(1).

This argument applies *Hicks* far too broadly. The Court of Appeal's summary dismissal was not "so lacking in justification that there was an error well understood and comprehended in existing law" concerning the application of *Hicks*. *Richter*, 562 U.S. at 103. Rather, "[t]he Ninth Circuit has rejected a broad reading of Hicks." *McNally v. Frauenheim*, 2018 WL 4006330, at *7. In *Gonzalez v. Wong*, 667 F.3d 965, 995 (9th Cir. 2011), the Ninth Circuit held that *Hicks* did not apply where the prosecutor's closing argument in the penalty phase of a case allegedly violated state law. And in *Hubbart*, the Ninth Circuit ruled that *Hicks* was inapplicable to a petitioner who was subject to civil confinement under the Sexually Violent Predator Act because *Hicks* concerns the sentencing of prisoners. 379 F.3d at 780. Other circuits have also declined to extend *Hicks*. *See, e.g.*, *Simpson v. Norris*, 490 F.3d 1029, 1034 (8th Cir.2007) ("*Hicks* represents a rather narrow rule: some aspects of the sentencing process, created by state law, are so fundamental that the state must adhere to them in order to impose a valid sentence." (citation and quotation omitted); *Johnson v. Rosemeyer*, 117 F.3d 104, 112 (3d Cir. 1997) ("*Hicks* involved an unusual situation which the Supreme Court concluded required due process treatment.").

Case No.: 5:16-cv-01359-EJD
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
9

Moreover, the court finds that the circumstances here are not like those in *Hicks*. There, the state appellate court upheld a mandatory 40-year sentence that was based on a constitutionally invalid law while the proper sentencing instruction would have allowed the jury to set the petitioner's sentence as short as ten years. 447 U.S. at 346. The Supreme Court reasoned, "the petitioner had a statutory right to have a jury fix his punishment in the first instance, and this is the right that was denied . . . . [I]t is a right that substantially affects the punishment imposed." *Id.* 347. The appellate court deprived the petitioner of his right to have a jury consider a sentence as brief as ten years. *Id.* at 346-47. Mr. Prescott does not contend that there was such a deprivation of a statutory right here, nor does he identify any federal rights implicated by *Duvall* or *Hall*. Rather, he contends that he submitted enough evidence—including evidence admissible under *Hall*—to present a prima facie case and require the Court of Appeal to issue an order to show cause. The Court of Appeal's summary denial of his state habeas petition indicates though that the Court of Appeal found that he had not stated a prima facie case for relief. Dkt. No. 14-13 at 3. "[S]ummary denial of a habeas petition on the merits reflects that court's determination that 'the claims made in th[e] petition do not state a prima facie case entitling the petitioner to relief.'" *Pinholster*, 563 U.S. at 188 n.12 (quoting *In re Clark*, 5 Cal. 4th 750, 780-81 (1993), *superseded by statute on other grounds as stated in Briggs v. Brown*, 3 Cal. 5th 808, 842 (2017)). Unlike the defendant in *Hicks*, Mr. Prescott was not denied a right; rather the Court of Appeal denied his petition on the merits. The Court of Appeal's decision was neither contrary to, nor an unreasonable application of *Hicks*.

Mr. Prescott also cites *Cuero v. Cate* to argue that the Court of Appeal's decision violated his constitutional rights for similar reasons to those expressed above. 827 F.3d 879 (9th Cir. 2016), *cert. granted, judgment rev'd sub nom. Kernan v. Cuero*, 138 S. Ct. 4, 199 L. Ed. 2d 236 (2017). In reversing the Ninth Circuit's decision based on the ordered remedy, the Supreme Court did not directly address the analysis that undergirds Mr. Prescott's position here – that the State had violated the *Cate* petitioner's constitutional rights by moving to amend the complaint after they had entered a plea deal. *Kernan*, 138 S. Ct. at 8 ("We shall assume purely for argument's

Case No.: 5:16-cv-01359-EJD
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
10

sake that the State violated the Constitution . . . ."). To the extent any of *Cate* remains good law, this court though finds that the Ninth's Circuit's reasoning on that issue is not applicable to the facts before this court. The Ninth Circuit found that "[a] defendant's guilty plea implicates the Constitution," such that the "guilty plea seals the deal between the state and the defendant, and vests the defendant with "a due process right to enforce the terms of his plea agreement." *Cuero*, 827 F.3d at 885 (quotations and citations omitted). For the reasons discussed above, neither *Duvall* nor *Hall* implicate the Constitution.

Finally, Mr. Prescott's reliance on *Carrier*, *Schlup*, and *House* does not support his claim. All three cases are inapposite because they dealt with actual innocence claims as a means to overcome procedural default. Procedural default is not an issue here.

Mr. Prescott's first claim does not warrant relief.

### b. Mr. Prescott's Second Claim

Mr. Prescott's second claim is that his trial counsel, Mr. Plaine, was constitutionally deficient for failing to adequately investigate the authorship of the Letters. Claims based on the ineffective assistance of counsel have two prongs. First, "the defendant must show that counsel's performance was deficient." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Second, "the defendant must show that the deficient performance prejudiced the defense." *Id.* "To establish deficient performance, a person challenging a conviction must show that counsel's representation fell below an objective standard of reasonableness." *Richter*, 562 U.S. at 104 (citation and quotation omitted). Habeas courts should apply a "strong presumption that counsel's representation was within the wide range of reasonable professional assistance." *Id.* (citation and quotation omitted). Regarding the prejudice prong, the petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* The attorney's errors must have been so serious as to deprive the petitioner of a fair trail whose result is reliable. *Id.* "The inquiry under Strickland is 'highly deferential, and 'every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the

Case No.: 5:16-cv-01359-EJD
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
11

circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Greenway v. Ryan*, 856 F.3d 676, 679-80 (9th Cir. 2017) (quoting *Strickland*, 466 U.S. at 608).

"The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (quotations and citations omitted). "Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." *Id.*

Mr. Prescott contends that Mr. Plaine's investigation of the Letters was deficient because it did not continue after Mr. DeGarmo concluded that he could not reach a conclusion as to whether Mr. Jones was the author. Mr. Prescott contends that Mr. DeGarmo was not qualified to examine the letters and did not conduct an adequate analysis of the letters' handwriting. He further argues that given the importance of the letters, Mr. Plaine was constitutionally obligated to further investigate the letters' handwriting and authorship after Mr. DeGarmo's inconclusive result. He supports this argument with the declaration of Ms. Fisher.

The court concludes that it was not unreasonable for the Court of Appeal to reject this claim. To begin, there was considerable evidence that Mr. DeGarmo was well qualified to analyze the letters, and it was not unreasonable for the state court to reach that conclusion. Mr. DeGarmo has testified as an expert in over 300 cases. Dkt. No. 14-8 at 19. He undertook a five-year apprenticeship under the Chief Document Examiner in the California State Bureau of Criminal Identification and Investigations. *Id.* From 1976 to 2006, his job title was "Examiner of Questioned Documents" in the Alameda County Public Defender's Office, where he worked as the in-house handwriting expert. *Id.* at 10, 20. Next, based on the evidence, it was not unreasonable for the Court of Appeal to find that Mr. DeGarmo's analysis met the *Strickland* reasonableness standard. Mr. Plaine initially provided Mr. DeGarme with the two letters and three samples of Mr. Jones's handwriting. Dkt. No. 14-8 at 9. Mr. DeGarmo then indicated that he needed more

Case No.: 5:16-cv-01359-EJD
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
12

samples of Mr. Jones's handwriting, so Mr. Plaine provided him with an additional 21 pages of Mr. Jones's handwriting. *Id.* Mr. DeGarmo later stated his inability to reach a conclusion to Mr. Plaine by explaining that too many variations and differences to be inconclusive. Dkt. N0. 14-8 at 9-10, 18.

Finally, it was not unreasonable for the Court of Appeal to conclude that Mr. Plaine performed reasonably by not continuing to investigate the authorship of the letter. When Mr. DeGarmo told Mr. Plaine that he could not reach a conclusion as to whether Mr. Jones had written the letters, he did not indicate that further investigation would be useful, nor did he request further information, as he had previously. Dkt. No. 14-8 at 10. Mr. Plaine "relied on [Mr. DeGarmo's] analysis, thinking he had provided [Mr. Plaine] an answer," so Mr. Plaine "had no reason to think further investigation would be useful." *Id.* "Attorneys are entitled to rely on the opinions of properly selected, adequately informed and well-qualified experts." *Crittenden v. Ayers*, 624 F.3d 943, 966 (9th Cir. 2010). Even though Mr. DeGarmo's analysis of the authorship of the letters did not result in exculpating evidence, Mr. Plaine did not perform unreasonably by "mak[ing] the judgment not to pursue [the] line of inquiry further." *Id.*

Mr. Prescott's second claim is denied.

### c. Mr. Prescott's Third Claim

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with the witnesses against him." U.S. Const. amend. VI. The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. *Crawford v. Washington*, 541 U.S. 36, 61 (2004). The Confrontation Clause applies not only to in-court testimony but also to out-of-court statements introduced at trial, regardless of the admissibility of the statements under state laws of evidence. *Id.* at 50-51. Confrontation Clause claims are subject to harmless error analysis. *United States v. Nielsen*, 371 F.3d 574, 581 (9th Cir. 2004); *see also United States v. Allen*, 425 F.3d 1231, 1235 (9th Cir. 2005). For purposes of federal habeas corpus review, the standard applicable to violations of the Confrontation Clause is whether the inadmissible evidence had an

Case No.: 5:16-cv-01359-EJD
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
13

actual and prejudicial effect upon the jury. *See Hernandez v. Small*, 282 F.3d 1132, 1144 (9th Cir. 2002) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

The Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). Accordingly, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examinations based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986); *see also Plascencia v. Alameda*, 467 F.3d 1190, 1201-02 (9th Cir. 2006) (exclusion of cross-examination that would have provided cumulative or repetitive evidence did not violate Confrontation Clause or was harmless error); *Menendez v. Terhune*, 422 F.3d 1012, 1033 (9th Cir. 2005) ("[A] trial judge may exclude or limit evidence to prevent excessive consumption of time, undue prejudice, confusion of the issues, or misleading the jury. The trial judge enjoys broad latitude in this regard, so long as the rulings are not arbitrary or disproportionate." (citations omitted)).

Here, Mr. Prescott contends that his rights under the Confrontation Clause were violated by the trial court's decision to bar cross-examination of Ms. Williams. Ms. Williams had told the police that when Mr. Prescott returned to the car, he was carrying a gun and that Mr. Prescott had told her that Mr. Jones had "wanted to shoot" but that Mr. Prescott "ran up on the dude." Dkt. No. 1-6 at 2. At trial though, she testified that she did not remember seeing a gun and that her statements to the police were "not really true. *Id.* During the trial, counsel for Mr. Jones filed a motion to question Ms. Williams about her testimony in an unrelated murder trial, which was proceeding at the same time. *Id.* at 11-12. Mr. Prescott argues that cross examination would have produced evidence that—in the other case—she had lied to the police in order to incriminate her husband, but later contradicted those statements in her trial testimony. The trial judge acknowledged that this evidence would be relevant to her credibility but excluded the evidence because of the likelihood of it creating confusion and undue delay outweighed its probative value.

Case No.: 5:16-cv-01359-EJD
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
14

*Id.* at 12. The Court of Appeal found that this evidence would be cumulative and have little probative value because her credibility was already "severely undermined." *Id.* Her testimony contradicted important aspects of her statements to the police. *Id.* She testified that she had "fabricated a little bit" of those statements. *Id.* She had been impeached with her three felony convictions. *Id.* She testified that alcohol and drug use impaired her memory when she was under the influence. *Id.* She also answered in the affirmative to the question "do you think it's fair to say that this statement is true: That you are willing to lie often to get what you want." *Id.* (alteration omitted).

Mr. Prescott argues that the Supreme Court case *Davis v. Alaska* is on point and should control here. 415 U.S. 308 (1974). The court disagrees. There, the defendant was convicted of burglary and grand larceny for stealing a safe from a bar largely due to the testimony of a juvenile witness. *Id.* at 310-11. At the time, the witness was on probation by order of a juvenile court for burglarizing two cabins. *Id.* Citing state laws protecting the confidentiality of juvenile adjudications of delinquency, the trial court prohibited the defense from impeaching the witness about his probation and adjudications of delinquency. *Id.* at 312. The Supreme Court reversed. It acknowledged "the broad discretion of a trial judge to preclude repetitive" testimony, but found in that instance that the defendant was "unable to make a record from which to argue why" the witness was biased. *Id.* at 316, 318.

The circumstances here are not analogous. Ms. Williams changed her story on the stand, and stated that she had initially misled the police so that she would not be charged. Dkt. 1-2 at 28. So, Mr. Prescott had a record from which he could argue that Ms. Williams was biased when she gave her initial statements to the police. Cross examination concerning her testimony in her husband's murder trial would have gone to solely to her credibility. As the Court of Appeal noted, that subject was thoroughly covered at trial. The precluded cross examination would have been cumulative and lacking in probative value. Its exclusion was not an error warranting relief here.

Mr. Prescott's third claim for relief is denied.

## IV. Conclusion and Certificate of Appealability

For the reasons discussed in this order, Mr. Prescott's petition is denied. His Request for Order is terminated. Dkt. No. 25. The court issues a certificate of appealability as to his first and second claims. 28 U.S.C.§ 2253(c).

**IT IS SO ORDERED.**

Dated: December 12, 2019

_____
EDWARD J. DAVILA
United States District Judge